UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
HEIDI HUSSER,                                                    REPORT AND
                          Plaintiff,                 RECOMMENDATION

        - against -
NEW YORK CITY DEPARTMENT                                         12-CV-6095 (MKB) (JO)
OF EDUCATION, et al.,
                        Defendants.
--------------------------------------------------------X

James Orenstein, Magistrate Judge:

      Plaintiff Heidi Husser ("Husser"), an employee in the Division of School Facilities ("DSF")

within the New York City Department of Education ("DOE"), has accused the DOE and two of

her supervisors of gender-based discrimination and retaliation, in violation of federal, state, and

municipal law. *See* Docket Entry ("DE") 16 (Second Amended Complaint) ("Complaint"). The

defendants now seek summary judgment. DE 43. Upon a referral from the Honorable Margo K.

Brodie, United States District Judge, I now make this report, and for the reasons set forth below,

respectfully recommend that the court grant the motion with respect to the hostile work

environment claims and deny it in all other respects.

I.      Background

     A.    Facts

      The following brief summary of background facts is drawn from the parties' statements of

undisputed facts pursuant to Local Civil Rule 56.1 and set forth in the light most favorable to

Husser as the non-moving party. *See* Local Civ. R. 56.1; Fed. R. Civ. P. 56(a); *Schiano v. Quality Payroll

Sys.*, 445 F.3d 597, 603 (2d Cir. 2006); DE 46 (Defendants' Rule 56.1 Statement) ("Def. Stmt."); DE

51 (Plaintiff's Rule 56.1 Statement) ("Pl. Stmt."); *see also* DE 44 (defendants' memorandum)

("Memo"); DE 48 (defendants' reply memorandum) ("Reply"); DE 50 (Husser's memorandum in

opposition ("Opp."). A more detailed summary of the facts pertinent to each particular claim is set

forth at the start of the discussion of that claim.

Husser began working for the DOE on August 19, 2008,[1] and is currently employed as the DSF's Director of Labor Relations. Husser's supervisors in that position include DSF's Chief Executive Officer ("CEO"), defendants John Shea ("Shea"), and also DSF's Executive Director, defendant John O'Connell ("O'Connell").  Complaint ¶¶ 4-8.

Husser's annual salary started at $80,749. On July 1, 2009, when the DOE raised the salaries of all of its employees, Husser's annual pay rose to $83,577. Pl. Stmt. ¶¶ 9, 46; Def. Stmt. ¶¶ 9, 46; Stodola Decl. Ex. S (base salary chart) ("Salary chart") at 4. Husser's salary is lower than that of the directors of eight other DSF components: Bernard Orlan, director of Environmental Health & Safety; Angelo Lisa, director of Emergency Preparedness; Al Boccio, director of Information Technology ("IT") Services; Volkert Braren, director of Program Management; William Wilson, director of Human Resources; Salvatore Calderone, director of Field Operations; Frank Borowiec, director of Facility Management Services; and Bramnarain Mahadeo, director of Maintenance. Pl. Stmt. ¶ 15, 48; Def. Stmt. ¶¶ 15, 48.[2] All of the allegedly comparable directors are male; aside from Husser, the only other female Director at DSF was Sheila Dancy-Wilkins, who held that position from 2008 to 2010. Complaint ¶ 32.

Husser alleges that DSF had a sexist culture that was hostile to women in general and to her in particular. She asserts that throughout her employment, high-ranking officials, including defendants Shea and O'Connell, routinely referred to women as "girls," "hot," "doable" and "adorable," commented about having sex with certain women in the office, and permitted and encouraged sexual innuendo and sexually demeaning name-calling. Husser more specifically

---

[1] The Complaint alleges that Husser began working for DSF on August 18, 2008, but the parties agree that she was hired on August 19, 2008. *See* Def. Stmnt 9; Pl. Stmnt 9; Salary Chart at 4.

[2] As a convenient shorthand, I refer below to each of these directors by his surname. The parties disagree as to whether Husser and these other component directors have comparable jobs, as discussed in detail below.

complains that Shea and O'Connell subjected her to a dozen specific offensive remarks and incidents from late 2009 through July 2012. *See* Complaint ¶¶ 12-15; Pl. Stmt. ¶¶ 85, 103, 106, 108-09.

Husser informally complained about the foregoing to the DOE's Executive Director of the Office of Equal Employment Opportunity ("OEEO"), Mecca Santana ("Santana") in March or April 2012. She filed a formal complaint with OEEO on July 5, 2012, alleging sexual harassment, unlawful pay practices, and gender discrimination. OEEO assigned an investigator to the matter. Husser was interviewed on July 9, 2012, and as the investigation continued, Husser made additional allegations about her pay and work environment. Complaint ¶ 35; Pl. Stmt. ¶¶ 20-22; Def. Stmt. ¶¶ 20-22.

Husser claims that over the next several months, the defendants retaliated against her for complaining by: asking her for the first time to justify her absences; closely monitoring her performance; excluding her from meetings, conference calls, and group email exchanges; and temporarily revoking her privilege to use a DSF car. Complaint ¶¶ 36-37; Pl. Stmt. ¶¶ 23, 25, 121-28; Def. Stmt. ¶¶ 23, 25; Opp. at 23.

The OEEO issued its final report on Husser's complaint on October 11, 2102. It found Husser's claims were not substantiated, but criticized Shea for failing to self-report Husser's complaint. Pl. Stmt. ¶¶ 26-28; Def. Stmt. ¶¶ 26-28. The report also noted a "history of inappropriate conduct by all involved parties" and that Shea had stated that "Husser's salary, based upon her title, should be higher." Stodola Decl., Ex. K (the "OEEO Report") at 23. The report further recommended that "any reasons for Ms. Husser's salary being substantially lower than other directors at DSF be explicitly tied in with performance." *Id.* Shea received a two-week suspension following the report. Pl. Stmt. ¶ 131; DE 52 (Paster Decl.), Ex. A ("Shea Dep.") at 246-47.

Husser claims that the defendants continued to retaliate against her after the OEEO issued its report. Prior to the OEEO Report, Husser and all other DSF directors held parallel positions on the Division's organizational chart. On January 15, 2013, however, in a move that Husser describes as an effective demotion, the DOE appointed Linda Green ("Green") to the newly created position of Chief Administrative Officer, and had Husser and three other directors – Boccio, Braren, and Wilson – report directly to her rather than to CEO Shea. Soon thereafter, Green made Husser move to a cubicle that Husser found less convenient. Complaint ¶ 39; Pl. Stmt. ¶¶ 30-35; Def. Stmt. ¶¶ 30-35; Salary Chart at 3; *see* Stodola Decl., Ex. R ("Organizational Chart"). In addition, Husser asserts that she was excluded from some participation in a union arbitration in September 2013, although the parties agree that then-Executive Director Estelle later invited Husser to attend the arbitration and Husser declined. Green also allegedly denied Husser's request to attend a continuing legal education ("CLE") program in December 2013. Pl. Stmt. ¶¶ 36, 39-44; Def. Stmt. ¶¶ 36, 39-44.

    B.   <u>Proceedings</u>

Husser filed a complaint with the EEOC on November 21, 2012 and was issued a right-to-sue letter on July 25, 2013. She filed her initial complaint in this court alleging a violation of the Equal Pay Act on December 12, 2012, DE 1; Husser then filed her first amended pleading on April 12, 2013, adding claims under the Human Rights Laws and New York State and New York City, DE 12; and then filed a second amended pleading adding claims under Title VII of the Civil Rights Act of 1964, as amended – the operative Complaint that the instant motion addresses – on September 6, 2013. *See* 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); 29 U.S.C. § 206(d) (the "Equal Pay Act" or "EPA"); N.Y. Exec. Law §§ 290 *et seq.* (the "NYSHRL"); N.Y.C. Admin. Code §§ 8-101 *et seq.* (the "NYCHRL"); Complaint ¶¶ 42-46 (Count 1 and 2; Equal Pay Act claims), ¶¶ 47-48, 53-54, 59-60 (Counts 3, 6, and 9; discrimination, hostile work environment, and retaliation claims under Title

VII), ¶¶ 49-50, 55-56, 61-62 (Counts 4, 7, and 10; similar claims under the NYSHRL), ¶¶ 51-52, 57-58, 63-64 (Counts 5, 8, and 11; similar claims under the NYCHRL). Following discovery, the parties filed the instant fully briefed motion on January 12, 2015, *see* DE 43, and the court referred it to me by order dated April 3, 2015.

II.     Discussion

The defendants move to dismiss each of Husser's claims. They argue that Husser's pay-related claims fail both because her job is not sufficiently comparable to the other DSF directors about whose higher salaries Husser complains and because her salary was determined pursuant to a gender-neutral plan for managerial compensation. The defendants further assert that they are entitled to judgment on the retaliation claims because Husser cannot demonstrate that she was subjected to any cognizable adverse employment action and that the record – and in particular the length of time between Husser's complaints and the actions about which she complains – does not permit an inference that they had any retaliatory motive. Finally, they contend that the record does not support of the proposition that Husser was subjected to a hostile work environment. I address each issue in turn below after first discussing the applicable legal standard and procedural matters.

A.      Standard of Review

"Summary judgment is warranted only upon a showing by the movant that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jaramillo v. Weyerhauser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations and internal quotation marks omitted); *accord Moore v. City of New York*, 2015 WL 1198084, at *3 (E.D.N.Y. Mar. 16, 2015); Fed. R. Civ. P. 56(a). A fact is material if it "'might affect the outcome of the suit under the governing law.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue is presented if "'the evidence is such that a

5

reasonable jury could return a verdict for the nonmoving party.'" *Holtz*, 258 F.3d at 69. In determining whether to grant summary judgment, a court is confined to issue-finding, not issue-resolution. *Jillian Mech. Corp. v. United Serv. Workers Union Local 355*, 882 F. Supp. 2d 358, 364 (E.D.N.Y. 2012) (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). The court does not "weigh the evidence and resolve … factual issues" but rather "determine[s] as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 408 (2d Cir. 1991) (quoting *Gibson v. Am. Broadcasting Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989)); *see also* Fed. R. Civ. P. 56(a).

The moving party must demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *accord Moore,* 2015 WL 1198084, at *3. If the moving party meets that burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Anderson*, 477 U.S. at 249). "To defeat a summary judgment motion, the non-moving party … may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal citations omitted). Moreover, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Monclova v. City of New York*, 2014 WL 4828813, at *8 (E.D.N.Y. Sept. 29, 2014) (quoting *Anderson*, 477 U.S. at 248). In assessing the evidence, "all reasonable inferences are drawn in favor of the non-movant[.]" *Wellesley v. Debevoise & Plimpton LLP*, 346 F. App'x 662, 662 (2d Cir. 2009).

In evaluating an employer's motion for summary judgment in the context of an employment discrimination action, courts must be "especially cautious" in light of the difficulty of locating direct evidence of the employer's discriminatory intent, and the need to evaluate circumstantial proof of its

intentions. *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999). Nevertheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Edwards v. Jericho Union Free Sch. Dist.*, 55 F. Supp. 3d 458, 465 (E.D.N.Y. 2014) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)).

    B.    <u>Timeliness</u>

        1.    <u>Pay Discrimination</u>

In an argument improperly relegated to a footnote, the defendants contend that Husser's pay discrimination claims under Title VII and state and municipal law are almost completely time-barred. Specifically, they assert that Husser can seek relief on her Title VII pay discrimination claim only for paychecks received on or after February 12, 2012 (300 days prior to Husser's EEOC complaint). They further argue that Husser can secure no relief at all for pay discrimination under the NYSHRL and NYCHRL, each of which they say has an applicable one-year limitations period, because the salary of which she complains was set more than a year before she initiated this action. *See* Memo. at 12-13 n.4. As explained below, I disagree.[3]

---

[3] As a threshold matter, this court can and should ignore an argument that the proponent deems worthy of neither committing to the main text of its brief nor summarizing in a point heading in its table of contents. *See* Loc. Civ. R. 7.1(a)(2) (requiring supporting memoranda to be "divided, under appropriate headings, into as many parts as there are issues to be determined"); *Maloney v. Cty. of Nassau*, 623 F. Supp. 2d 277, 290 n.2 (E.D.N.Y. 2007) ("this Court would be reluctant to grant any relief on the strength of a single sentence contained in a footnote" (citing Loc. Civ. R. 7.1)), *order clarified on other grounds on reconsideration*, 2009 WL 922064 (E.D.N.Y. Mar. 31, 2009). Among other vices, such argument by footnote allows a party to evade the page limits on memoranda the applicable local rule prescribes. *See* Loc. Civ. R. 7.1(c).

First, pursuant to the Ledbetter Fair Pay Act (the "Ledbetter Act"), 42 U.S.C. § 2005e-5(e),

the continuing violation doctrine allows Husser to seek relief under Title VII for continuing pay

discrimination, if any, about which she timely complained. Second, the one year limitations period

under state and municipal law applies only to claims against schools, school districts, and boards of

education. N.Y. Educ. Law § 3813(2-b); *see Amorosi v. South Colonie Indep. Cent. School Dist.,* 9 N.Y.3d

367, 373 (App. Div. 2007). Husser's pay discrimination claims against the individual defendants

under the NYSHRL and NYCHRL are subject to a three-year limitations period. *See* N.Y. C.P.L.R.

§ 214(2); N.Y.C. Admin. Code § 8–502(d).

Third, the defendants' argument, if accepted, would produce the anomalous result of treating

each new paycheck as the basis for a pay discrimination claim under federal law, while

simultaneously finding that Husser's claims accrued only when her salary was set for purposes of the

state and municipal claims. Of course, the court in *Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S.

618 (2007) found the so-called continuing violation theory did not apply to equal pay claims under

federal law, but Congress quickly rejected that statutory construction by enacting the Ledbetter Act.

The question thus becomes what effect, if any, the legislative clarification that the continuing

violation doctrine applies to federal pay discrimination claims has on the interpretation of

corresponding state and municipal laws.

The defendants rely on a brief passage in *Russell v. County of Nassau*, 696 F. Supp. 2d 213, 230

(E.D.N.Y. 2010) for the proposition that because Congress did not amend state law (and because

the New York legislature did not enact a corresponding state law), the continuing violation doctrine

embodied in the Ledbetter Act was not exported to claims under the NYSHRL (or, the defendants

add, to claims under the NYCHRL, even though *Russell* did not address such claims at all). The

decision in *Russell* is of course correct that Congress could not and did not amend state law – but I

respectfully suggest that that does not suffice to end the analysis under either the NYSHRL or the NYCHRL.

With respect to the state statute, the case law of this circuit is clear that the federal and state civil rights laws are to be given similar constructions. *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL are 'analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is … under Title VII.'" (citation omitted)); *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (analyzing NYSHRL claim under same framework as Title VII claim at summary judgment). It would therefore be anomalous to hold that because Congress – in acting to correct what it viewed as the Supreme Court's incorrect interpretation of Title VII in *Ledbetter* by changing the text of the federal statute the Court considered – had not also acted *ultra vires* to change state law, that a federal court should continue to give state law a construction parallel to the now-rejected construction of prior federal law. Instead, it makes more sense, and is more faithful to controlling law, to continue to construe the two laws similarly and therefore to construe a claim of pay discrimination to assert a continuing violation under both. That is exactly what a number of state courts in New York have concluded in interpreting the NYSHRL in the aftermath of the Ledbetter Act. *See Williams v. Deutsche Bank Grp.*, 2013 WL 1455924, at *6 n.1 (N.Y. Sup. Ct. 2013) (collecting cases applying Ledbetter Act to state and city equal pay discrimination claims).

With respect to municipal law, the defendants' reliance on *Russell* is even more plainly misplaced – not only because *Russell* said nothing about the NYCHRL, but more importantly because the law is clear that the latter statute must be interpreted broadly to achieve its remedial goal. For that reason as well, New York courts rely on the Ledbetter Act to treat claims of pay discrimination under the NYCHRL as continuing violations. *See Deutsche Bank Grp.*, 2013 WL

1455924 at *6 n.1 (collecting cases); *see also Mohamed v. NYU*, 2015 WL 3387218, at *19-20 (S.D.N.Y. May 21, 2015) (report and recommendation) (adopting continuing violation doctrine for equal pay claim under NYCHRL), *adopted* (S.D.N.Y. Sept. 10, 2015).[4] Accordingly, I conclude that Husser's pay discrimination claims are all timely asserted as allegations of continuing violations.

2.   Hostile Work Environment

The defendants assert – again in a footnote – that Husser's federal hostile work environment claim is time-barred because such claims must be brought within 300 days of the discriminatory act. Memo at 16 n.9; *see* 42 U.S.C. § 2000e-5(e)(1). But a hostile work environment claim by its very nature involves repeated conduct over time rather than a discrete occurrence on a particular day. *See, e.g., Ferraro v. New York City Dep't of Educ.*, 2015 WL 1476392, at *7 (E.D.N.Y. Mar. 31, 2015) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). It is therefore timely if at least one act contributing to the claim occurred within the limitations period. *See Patterson v. Cnty of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (citing *Morgan,* 536 U.S. at 115). As the defendants concede, at least one such alleged act occurred in 2012. *See* Complaint ¶ 16; Memo at 16 n.9; Opp. at 25. The federal hostile work environment claim is therefore timely.

C.   Equal Pay

1.   The Equal Pay Act

a.   The Applicable Legal Standard

Husser claims that the defendants willfully failed to pay her wages equal to those paid to men for equal work. Complaint ¶¶ 42-44. The Equal Pay Act "prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the

---

[4] The court in *Mohamed* applied pre-*Ledbetter* case law to reject the application of the continuing violation doctrine to the plaintiff's claim under the NYSHRL. 2015 WL 3387218 at *19-20. For the reasons set forth above, I respectfully disagree with that part of the analysis.

10

opposite sex for 'equal work.'" *Chepak v. Metro. Hosp.*, 555 F. App'x 74, 76 (2d Cir. 2014) (quoting *Belfi*, 191 F.3d at 135). For purposes of both federal and state law, this claim is governed by the familiar burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Rambacher v. Bemus Point Cent. Sch. Dist.*, 307 Fed. App'x. 541, 543 (2d Cir. 2009) (citing *McDonnell Douglas*, 411 U.S. at 792); *Setelius v. Nat'l Grid Elec. Svcs. LLC*, 2014 WL 4773975, at *6 (E.D.N.Y. Sept. 24, 2014) (applying same analysis to state law discrimination claims); *Sista v. CDC Ixis North Am., Inc.*, 2005 WL 356973, at *6 n.7 (S.D.N.Y. Feb.15, 2005) (same).

Applying that burden-shifting analysis to the instant equal pay claim requires Husser to make an initial showing that her employer pays different wages to employees of the opposite sex; that the differentially paid employees perform equal work on jobs requiring equal skill, effort and responsibility; and that the jobs are performed under similar working conditions. *E.E.O.C. v. Port Auth. Of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (citing *Belfi*, 191 F.3d at 135). If she makes that showing, "the burden shifts to the employer to demonstrate that wage disparities are due to … [a system of] differentials based on any factor other than sex, provided it was implemented for a legitimate business reason." *Forden v. Bristol Myers Squibb*, 63 F. App'x 14, 15 (2d Cir. 2003) (quoting *Belfi*, 191 F.3d at 136). "Once the employer proves that the wage disparity is justified[,] …'the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination.'" *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000) (quoting *Belfi*, 191 F.3d at 136).

### b. *Prima Facie* Case

Husser predicates her equal pay claims on a comparison of her salary with the higher salaries of eight male directors of other DSF components. DSF has a pay scale that assigns to each position a pay level designated by an alphanumeric code; the following chart summarizes the pay levels, the

corresponding annual salary ranges, and the actual annual salaries paid to Husser and each of her putatively comparable male colleagues.

| Name | Directorship | Pay Level | Salary Range | Actual Salary |
|---|---|---|---|---|
| Husser | Labor Relations | G3[5] | $70,000 - $105,000 | $83,577 |
| Boccio | Information Technology | G4 | $81,000 - $124,000 | $107,959 |
| Wilson | Human Resources | G4 | $81,000 - $124,000 | $117,653 |
| Mahadeo | Maintenance | G5 | $95,000 - $145,000 | $121,732 |
| Borowiec | Facility Management Services | G5 | $95,000 - $145,000 | $122,648 |
| Lisa | Emergency Preparedness | G4 (G5 PIO) | [no evidence[6]] | $125,046 |
| Braren | Program Management | L-VIII | $88,548 - $114,896 | $131,190 |
| Orlan | Environmental Health & Safety | G5 | $95,000 - $145,000 | $136,709 |
| Calderone | Field Operations | G5 | $95,000 - $145,000 | $145,000 |

Pl. Stmt. ¶¶ 95-101; Salary chart; Pay Plan, Ex. U through BB (job descriptions and resumes for each comparator). The record thus unequivocally establishes that Husser receives a lower salary than the eight male DSF directors to whom she compares herself.

Husser must also establish, however, that those colleagues have jobs similar to hers. She need not show that their respective jobs are "identical," but she must demonstrate that they are "substantially equal." *Lavin–McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001). That in turn requires that Husser prove that the jobs being compared have common duties or content, and do not simply overlap in titles or classifications. *E.E.O.C. v. Port Auth. of New York & New Jersey*, 2012 WL 1758128, at *3 (S.D.N.Y. May 17, 2012) ("superficial comparisons based on job title or code are insufficient"); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). The pertinent federal regulations provide that

---

[5] The parties treat the pay level and salary ranges for Husser's position summarized above as undisputed. Def. Stmnt. ¶¶ 16-17; Pl. Stmnt ¶ 16-17; Stodola Decl. Ex. E (new management pay plan and salary guidelines dated June 30, 2008) ("Pay plan") at 1; Salary Chart at 4. I note that the record includes evidence that the job description for the DSF Director of Labor Relations specifies that its pay level is "M5" and that its salary range is $75,835 to $98,399. DE 53-1 at 2.

[6] Neither Lisa's job description nor the managerial pay plan guidelines memorandum specifies the salary range for the Director of Emergency Preparedness or an employee with a pay level of "G-4 (G-5 PIO)."

"equal work" under the EPA is evidenced not by "job classifications or titles but ... rather on actual job requirements and performance." 29 C.F.R. § 1620.13(e); *see also* EEOC Compliance Manual § 10–IV(E) (2) (2000) ("[j]ob content … determines the equality of jobs[;]" "whether two jobs are substantially equal" turns on "whether the jobs have the same 'common core' of tasks"). Jobs that are "merely comparable" do not meet this standard. *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir. 1993), *overruled on other grounds by Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015). "[S]ome overlap in the requirements of the two jobs, is not … 'sufficient to show substantial equality under the EPA.'" *Detrick v. H & E Machinery, Inc.*, 934 F. Supp. 63, 70 (W.D.N.Y. 1996) (quoting *Koster v. Chase Manhattan Bank, N.A.*, 609 F. Supp. 1191, 1194 (S.D.N.Y. 1985)). Factors that are considered include whether the plaintiff and the comparator work in the same division, whether they have the same supervisor, whether they have similar responsibilities, and whether the employees are required to devote the same effort. *See Lichtenstein v. Triarc Cos.*, 2004 WL 1087263, at *11 (S.D.N.Y. May 14, 2004). Accordingly, although the question of whether two positions are equivalent is generally a factual issue for the jury, *see Lavin-McEleney*, 239 F.3d at 480, like any fact issue, it is still susceptible to summary judgment where no reasonable juror could find in the favor of the non-moving party.

Against this legal backdrop, I consider the following salient facts about Husser's job and those of her male colleagues:

- <u>Husser</u>: As DSF's Director of Labor Relations, Husser's responsibilities include representing the DSF in various employee and labor relations matters, including negotiations with employee unions, developing polices based on union contracts, grievances and work complaints; participating in collective bargaining sessions; overseeing the disciplinary action against custodial personnel and skilled trade employees; serving as an advisor to the Executive Director and other senior management in relation to custodial and skilled trade issues; working with certain facility and maintenance managers in disciplinary actions; researching and preparing for arbitrations or other litigation; and conducting trainings on custodial contract and disciplinary procedures. Husser has never supervised more than two clerical employees, nor has she directly supervised any subdivisions or other managers. Husser has no explicit budgetary authority, but does have some authority to settle lawsuits, approve invoices and approve payroll expenditures for custodial employees.

13

She is licensed to practice law in New York, and also has work experience outside the legal profession. Before coming to the DOE, Husser worked for the United States Postal Service from 1985 to 2003, during which time, from 1985 to 1996, she served as President of the Local 1984 American Postal Workers Union. While in law school, Husser had internships with the New York State Public Employment Relations Board, the Civil Service Employees' Association, and the Governor's Office of Employee Relations. Pl. Stmt. ¶¶ 9-10, 80-82; Def. Stmt. ¶¶ 7, 9-10; DE 47 (Stodola Decl.) Ex. F. (Husser Resume), Ex. DD (re-filed as DE 53-1) (Husser job description).

- <u>Boccio</u>: As Director of IT Services, Boccio oversees the development and maintenance of the application and software DSF uses; he manages a $1.7 million budget, supervises nine people, including programmers and clericals across three subdivisions, and is required to work after-hours as needed. He has fourteen years of experience including twelve in his current role. Def. Stmt. ¶¶ 62-63; Pl. Stmt. ¶¶ 62-63; Stodola Decl., Ex. U (Boccio resume and job description).

- <u>Wilson</u>: As Director of Human Resources, Wilson oversees all personnel policies and actions for both DSF and DOE's Office of School Support Services. He supervises 53 people, consisting of managers and clericals over two subunits. He has eighteen years of experience. Def. Stmt. ¶¶ 64-65; Pl. Stmt. ¶¶ 64-65,98; Stodola Decl., Ex. BB (Wilson resume and job description).

- <u>Mahadeo</u>: As Director of Maintenance, Mahadeo is responsible for overseeing the day-to-day maintenance operations and preparing an overall maintenance plan for the entire DOE, including overall day-to-day direction for repairs and maintenance operations. He directly manages a $137 million budget, four subdivisions, and 46 staff consisting of other supervisors, trades professionals, and clericals, and his position requires substantial after-hour work. He has thirteen years of experience, including a number of professional certifications covering a wide array of related fields. Def. Stmt. ¶¶ 52-53; Pl. Stmt. ¶¶ 52-53; Stodola Decl., Ex. Z (Mahadeo resume and job description).

- <u>Borowiec</u>: As Director of Facility Management Services, Borowiec oversees all aspects of the 140 DOE buildings that are not managed by custodial staff. He manages a $75 million dollar budget, three subdivisions and 49 staff consisting of unit heads, trade professionals and clerical staff. He has training in driving and hazmat endorsements, works after hours and has ten years of experience as supervisor of the DSF Trucking Department followed by ten years in managing the DSF's facilities, including seven in his current role. He is also expected to be available after hours. Def. Stmt. ¶¶ 56-57; Pl. Stmt. ¶¶ 56-57; Stodola Decl., Ex. V (Borowiec resume and job description).

- <u>Lisa</u>: As Director of Emergency Preparedness, Lisa coordinates DOE's emergency preparedness; he has responsibility over $10 million in capital and reimbursable federal funding, supervises two high-level managers and is required to work after hours. He has numerous certifications relating to his responsibilities, and twenty

years of experience, seven in his current role. Def. Stmt. ¶¶ 58-59; Pl. Stmt. ¶¶ 58-59; Stodola Decl., Ex. Y (Lisa resume and job description).

● <u>Braren</u>: As Director of Program Management, Braren is primarily responsible for the DSF's contracts management process and serves as the DOE's primary liaison to the School Construction Authority, the agency responsible for building facilities at the DOE. He supervises a $75 million dollar budget, oversees sixteen staff, including a Deputy Director, other managers, and clerical staff across three subdivisions, and his position requires availability after hours. He has ten years of experience running the DSF's Program Management functions, and eight years supervising, coordinating, and implementing processes to improve the skilled trades repair functions at the DSF. Def. Stmt. ¶¶ 50-51; Pl. Stmt. ¶¶ 50-51; Stodola Decl., Ex. W (Braren resume and job description).

● <u>Orlan</u>: As Director of Environmental Health & Safety, Orlan coordinates, directs and manages environmental health and safety issues; he supervises a $19 million budget and oversees three subdivisions and seventeen staffs, including managers, asbestos handlers and clerical staff. He has over twenty years of experience at DSF in this capacity and numerous certifications. Def. Stmt. ¶¶ 60-61; Pl. Stmt. ¶¶ 60-61; Stodola Decl., Ex. AA (Orlan resume and job description).

● <u>Calderone</u>: As Director of Field Operations, Calderone oversees the training, funding, auditing and administration of the custodian positions at the BOE.  He supervises six staff over four different functional areas, works after hours, has twenty years of experience at the DSF alone, is a licensed stationary engineer and has state certifications in refrigeration, air resources, gas welding, fuel oil, fire safety and asbestos, among others. Def. Stmt. ¶¶ 54-55; Pl. Stmt. ¶¶ 54-55; Stodola Decl., Ex. X (Calderone resume and job description).

The record thus gives each party sufficient evidence to cite in seeking to persuade a fact-finder that Husser performed equal to that of her more highly paid male colleagues. Husser can point to the fact that she and the other directors all have the same title; they all work for the same division; they all shared common supervision for much of the time at issue (and even after Green's appointment, Husser continues to have the same supervisors as three of her fellow directors); they all have specialized skills and experience; they all handle regulatory compliance for their respective components; and they all make decisions that affect DSF as a whole. The defendants can focus on the substantive differences among each directors duties and the wide array of their departments' respective sizes and budgets. In such circumstances, it is clearly the fact-finder's role to assess such

evidence and determine whether Husser has made a *prima facie* showing that she and her colleagues had comparable jobs for purposes of the Equal Pay Act; summary judgment on this issue is therefore unavailable.

c. <u>Facially Neutral Reason</u>

Once a plaintiff makes a *prima facie* showing of an EPA violation, the defendants must establish that the pay difference at issue is the result of a gender neutral system adopted for a genuine business reason. *See* 29 U.S.C. § 206(d)(1); *Tomka*, 66 F.3d at 1310; *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526 (2d Cir. 1992). "This limitation prevents the employer from relying on a compensation differential that is merely a pretext for sex discrimination-*e.g.*, determining salaries on the basis of an employee's height or weight, when those factors have no relevance to the job at issue." *Engelmann v. Nat'l Broadcasting Co.*, 1996 WL 76107, at * 7 (S.D.N.Y. Feb. 22, 1996). Thus, an employer may properly decide to pay higher salaries to employees with greater experience, more advanced educational degrees, or objectively better credentials than their co-workers. *See, e.g., Dey v. Colt Constr. & Dev.*, 28 F.3d 1446, 1462 (2d Cir. 1994); *Setelius,* 2014 WL 4773975, at *31; *Engelmann*, 1996 WL 76107, at * 10.

The defendants contend that DOE management positions are classified on an alphanumeric scale with a particular salary range for each management level, and that an individual manager's salary within that applicable range is based on that manager's prior salary and qualifications. They further assert that Husser's salary, like the higher salary of each of her male colleagues, was set in accordance with that policy. Memo at 11; *see* Def. Stmt. ¶ 15; Pl. Stmt. ¶ 15; Pay Plan at 1.

The defendants also argue that the putative comparators were hired at different times, had different salary histories, occupy positions with different grades, and have different civil service titles. Memo at 11. Indeed, each of the putative comparators has more than ten years of experience

16

in his respective field, each has worked ten or more years at the DOE and each has worked at least three years in his current position. They contend that those facts provide a sufficient non-discriminatory reason for the pay disparity of which Husser complaints, and thus shifts back to her the burden to show that the policy on which they rely is pretextual. *See Belfi*, 191 F.3d at 136-37; *see Harker v. Utica Coll. of Syracuse Univ.*, 885 F. Supp. 378, 389-390 (N.D.N.Y. 1995) (granting defendant's motion for summary judgment on the ground that plaintiff's male comparator was paid more because he had more experience and seniority than plaintiff); *Christiana v. Metropolitan Life Ins. Co.*, 839 F. Supp. 248, 250 (S.D.N.Y. 1993) ("Courts hesitate to substitute their judgment for that of the employer 'who has established and applied a bona fide job rating system, provided that it does not discriminate on the basis of gender.'") (citation omitted); *cf. Corning Glass Works v. Brennan*, 417 U.S. 188, 204 (1974) (noting that the EPA "contemplates that a male employee with 20 years' seniority can receive a higher wage than a woman with two years' seniority"). While such argument cannot by itself suffice to warrant a grant of summary judgment, it is enough to put Husser to the burden of showing that a trial is warranted on the issue of pretext.

### d.    Pretext

The defendants having adduced evidence of a gender-neutral pay system, Husser has the burden of proving that that system is in fact a pretext for sex discrimination. *See Aldrich*, 963 F.2d at 526. "'The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has 'use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices.'" *Id.* (citations omitted). The defendants "'cannot attain summary judgment unless the evidence ... on that issue is conclusive.'" *See Ebbert v. Nassau Cty.*, 2007 WL 674725, at *3 (E.D.N.Y. Mar. 29, 2009) (citations omitted).

17

The evidence here is not sufficiently conclusive to warrant summary judgment. Husser contends that the managerial pay scale allowed the defendants to exercise discretion in a discriminatory way to assign a managerial employee to a given pay level. The exercise of such discretion could result in a difference if up to a $59,000 between pay levels. In addition, the job listing to which Husser responded did not specify the assigned grade level; instead, it specified only that the salary was "$74,879+." Stodola Decl., Ex G (job posting) at 2. Further, CEO Shea testified that employees could be, and were, offered starting salaries above the salary range specified for a given position, and that he decided to obtain discretionary wage increases for some employees but not for Husser. *See* Pl. Stmt. ¶¶ 90-93; Shea Dep. at 189-90. On this record, I cannot conclude that no reasonable juror could make a finding of pretext. I therefore respectfully recommend that the court deny the motion for summary judgment on Husser's EPA claim.

2. <u>Title VII and the NYSHRL</u>

A claim of unequal pay for equal work under Title VII and the NYSHRL is generally analyzed under the same standards used in an EPA claim. *Hyek*, 461 F. App'x at 60; *Setelius*, 2014 WL 4773975, at *6.  Under Title VII and the NYSHRL, a plaintiff must show that she was a member of a protected class; she was qualified for the job in question; she was paid less than members outside of the protected class for the same work; and the employer's decision to pay the plaintiff less occurred under circumstances that give rise to an inference of discrimination. *Belfi*, 191 F.3d at 139-40. The same burden-shifting analysis also applies to the state law claim as to the claim under Title VII. Unlike an EPA plaintiff, a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a *prima facie* case of intentional sex-based salary discrimination. *See Aldrich*, 963 F.2d at 528. In order to establish a valid claim under Title VII for sex-based wage discrimination, a plaintiff can demonstrate a disparate impact from use of a facially

18

neutral employment practice, or present evidence of intentional sex-based wage discrimination. *Id.*; *see Lawless v. TWC Media Solutions, Inc.*, 487 F. App'x 613, 617-18 (2d Cir. 2012) (citation omitted).

Like her Equal Pay claims, Husser has shown that she was qualified for the job, paid less than other male comparators for substantially equal work and that the defendants' decision gives rise to an inference of discrimination. While Husser has not produced evidence that the DSF intentionally paid her less than any of her comparators because of her gender, she relies on the fact that those employees were paid more than she was, that they were similarly situated, that they are men and that the employer knew about the disparity because both O'Connell and Shea told Husser that her salary was "not what it should be." Opp. at 13; Pl. Stmt. ¶ 86-87; OEEO Report at 23. Additionally, Husser alleges that Shea had the authority to request raises for members of his staff and that he did so for certain members of his staff, including several male directors, but not Husser. Pl. Stmt. ¶ 92; Complaint ¶¶ 18-28. By showing that Shea and O'Connell knowingly failed to redress any discriminatory pay practice, Husser has met her burden to show that a triable issue of fact exists regarding whether the defendants acted with a discriminatory intent. I therefore respectfully recommend that the court deny the motion for summary judgment on Husser's discrimination claims under Title VII and the NYSHRL. *See Tomka*, 66 F.3d at 1313; *Belfi*, 191 F.3d at 139-40.

3.   NYCHRL

The court "'must analyze NYCHRL claims separately and independently from any federal and state law claims.'" *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (per curiam) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)); N.Y. City Admin. Code § 8–130. Under that municipal law, Husser must show only that she was treated less well than other employees because of her sex. *See Zambrano-Lamhaouhi v. New York City Bd. of Educ.*, 866 F. Supp. 2d 147, 160 (E.D.N.Y. 2011). For the same reasons discussed above that

the record warrants a trial on the corresponding federal and state law claims, I conclude that the evidence supporting Husser's discrimination claim under the more permissive NYCHRL is likewise sufficient to preclude summary judgment. I therefore respectfully recommend that the court deny the motion for summary judgment on Husser's discrimination claim under the NYCHRL.

      D.      <u>Retaliation</u>

            1.      <u>Title VII and the NYSHRL</u>

                  a.      <u>The Applicable Legal Standard</u>

To state a retaliation claim under Title VII and the NYSHRL, Husser must allege that she engaged in a protected activity, that the defendants were aware of it, and that as a result they subjected her to some sort of adverse employment action. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *Schiano*, 445 F.3d at 608; *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 322 (E.D.N.Y. 2014) (NYSHRL claims); *Sass v. M.T.A. Bus Co.*, 6 F. Supp.3d 238, 247 (E.D.N.Y. 2014) (collecting cases). To prove the required causal link, Husser must establish that the employer's retaliatory motive was a "but-for" cause of the adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (holding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation"); *Vega v. Hempstead Union Free Sch. Dist.*, 2015 WL 5127519, at *15 (2d Cir. Sept. 2, 2015) ("It is not enough that retaliation was a "substantial" or "motivating" factor in the employer's decision.").  Retaliation claims under Title VII are generally analyzed under the *McDonnell Douglas* test, which requires the plaintiff to establish a prima facie case, the defendant to articulate a non-discriminatory reason for its adverse employment action and then for the plaintiff to show that retaliation was the but-for cause of the adverse action. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n.6 (2d Cir. 2011).

"[T]he court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

The parties agree that Husser engaged in protected activity by informally complaining in April 2012 and then filing her complaint with the EEOC on July 5, 2012; and they further agree that the DOE was aware of this activity. They disagree as to whether the record sufficiently establishes the remaining elements of adverse employment action and causality; I address each issue in turn below.

### b.     Adverse Employment Action

In the context of a retaliation claim, an adverse employment action is any action that a reasonable employee would found the challenged action materially adverse that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). While Title VII "does not set forth a general civility code for the American workplace," *id.* at 68 (citations omitted), the scope of actions that may be materially adverse for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title VII's anti-discrimination provisions and "'extends beyond workplace-related or employment-related retaliatory acts and harm.'" *Hicks v Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington*, 548 U.S. at 67); *see Fincher*, 604 F.3d 712, 721 (2d Cir. 2010) ("The anti-retaliation law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" (quoting *Burlington*, 548 U.S. at 67)); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 224-25 (E.D.N.Y. 2014). In addition, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in

gross' as to be actionable." *Hicks*, 593 F.3d at 165. In evaluating whether an action is materially adverse, "'[c]ontext matters,' as some actions may take on more or less significance depending on the context." *Tepperwien*, 663 F.3d at 568. Accordingly, "alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Id.*

Husser points to several incidents as retaliatory adverse employment actions: the appointment of Green and the decision to make Husser report to her rather than to CEO Shea, which Husser characterizes as an effective demotion; the curtailment of some of her responsibilities; the lack of pay raises; the increased scrutiny of her time records; the temporary revocation of her privilege to use a company car; the denial of a training opportunity; and the relocation of her work station to a less desirable location. Opp. at 23.

Some of those alleged actions plainly do not suffice to support a claim of retaliation on their own. *See, e.g.*, *Dhar v. New York City Dep't of Transp.*, 2014 WL 4773965, at *13 (E.D.N.Y. Sept. 24, 2014) (finding that assigning plaintiff to work in certain environment was nothing more than merely annoying even under the less stringent retaliation standard); *Setelius*, 2014 WL 4773975 at *8 (finding that denying training to employee was not an adverse employment action even under more inclusive standard for retaliation claims); *Nicastro v. Runyon*, 60 F.Supp.2d 181, 186 (S.D.N.Y. 1999) (excessive scrutiny from supervisors and requiring documentation for sick leave could not support a Title VII retaliation claim); *but see Hicks*, 593 F.3d at 165 (finding that changes to plaintiff's work schedule and work location amounted to adverse employment actions because the changes results in work environments that were hazardous and dangerous).

Nevertheless, Husser has adduced evidence that, in the aggregate, could allow a reasonable jury to determine the conditions of her employment following her complaint to Santana and OEEO

were made sufficiently adverse to support a retaliation claim. The temporary revocation of Husser's car privileges, her exclusion from part of an arbitration, and the change in her supervision – resulting in her no longer reporting directly to the DSF CEO, but instead indirectly to him through Green – could all suffice, in the aggregate, to persuade a jury that Husser has succeeded in making the fact-intensive, context-specific showing of an adverse employment action. *See* Pl. Stmnt ¶¶ 92-93, 122-28; Opp. at 23; *see Vega*, 2015 WL 5127519, at *16-17 (finding that plaintiff adequately pleaded retaliation claims under Title VII where his assignment was changed, his paycheck was temporarily reduced, he was not notified of a curriculum change and was given a negative performance review); *Giordano-Forkan v. New York City Dep't of Educ.*, 2014 WL 5369426, at *3 (S.D.N.Y. Oct. 17, 2014) ("An action resulting in the denial of a pay raise can qualify as an adverse employment action."). *But see Kelly v. Huntington Union Free Sch. Dist.*, 2012 WL 1077677, at *16 (E.D.N.Y. Mar. 30, 2012) (the plaintiff's job transfer was not an adverse action because the plaintiff would receive the same compensation and benefits, she failed to indicate how her new position would fail to advance her career and instead "merely state[d] that it was a 'step down'").  Viewed in the context of her other allegations, it is plausible that the actions of which she complains could very well deter a reasonable worker from complaining. *Vega*, 2015 WL 5127519 at *16. Husser's claims thus "plausibly paint a mosaic of retaliation," *id.* at *17, that suffices to withstand the instant motion for summary judgment.

### c.   Causal Connection

Husser must also show that the adverse employment actions at issue were the result of her complaints. That causal connection "'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996). However,

"the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, (2001) (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554-555 & n.5 (2d Cir. 2001) (collecting cases). Nevertheless, gaps exceeding two to three months have generally – but not universally – been found too long to support an inference of causality. *See Vega*, 2015 WL 5127519, at *17 (three month gap between EEOC complaint and alleged retaliatory act found to be sufficient); *Cunningham v. Consol. Edison Inc.*, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases).

Husser informally complained to Santana sometime in the Spring of 2012, but she did not file a formal complaint until July 2012. She claims that the increased scrutiny of her time records, as well as her exclusion from meetings and calls, began that same month. Pl. Stmt. ¶¶ 36-37. While her allegations are disputed, they suffice to show that the Husser's formal complaint and the later actions were close enough in time to support an inference that they were causally related. Moreover, after the OEEO issued its report in October 2012 – which criticized Shea and noted that Husser's pay should be higher – Shea was suspended for two weeks. The following month, in November 2012, Husser temporarily lost her company car privilege; two months after that, on January15, 2013, Green was appointed and Husser was, as she hopes to persuade a fact-finder, effectively demoted. A jury could infer from that sequence of events that the defendants retaliated against Husser both for filing a formal complaint to the OEEO and for the official consequences to Shea of that complaint.

I therefore respectfully recommend that the court deny the motion for summary judgment on Husser's retaliation claims under federal and state law.

2.    NYCHRL

NYCHRL claims for retaliation are analyzed under a similar framework to Title VII and the NYSHRL, except that a plaintiff need only show the employer's conduct was "reasonably likely to deter a person from engaging in protected activity." NYCHRL § 8-107(7); *Williams*, 61 A.D. 3d 62, 71 (N.Y. App. Div. 2009); *Mihalik*, 715 F.3d at 112 (explaining the standard for evaluating retaliation claims under the NYCHRL). Under this more liberal standard, I similarly conclude that plaintiff has sufficiently pleaded a claim for retaliation for the same reasons as set forth above.

E.    Hostile Work Environment

To state a Title VII hostile work environment claim, Husser must show that she endured conduct that was severe or pervasive enough to create an objectively hostile or abusive work environment, that she subjectively perceived the conduct as hostile or abusive, and that the conduct occurred because of the plaintiff's sex. *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)). In assessing the work environment, the court must consider the totality of the circumstances, including the frequency and severity of the allegedly discriminatory conduct; whether it is threatening and humiliating rather than merely an offensive utterance; and whether it unreasonably interfered with Husser's work performance. *See Placide–Eugene v. Visiting Nurse Serv. of New York*, 2013 WL 2383310, at *12 (E.D.N.Y. May 30, 2013) (citing *Patane*, 508 F.3d at 113). "[T]he crucial inquiry focuses on the nature of the workplace environment as a whole." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000). To withstand summary judgment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the

25

conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quoting *Gorzynski v. JetBlue Airways, Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)). At issue here is whether the conduct of which Husser complains was objectively hostile, and whether it occurred because of her sex.

To establish that a work environment was objectively severe or hostile, "a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010). The requirement of "severe or pervasive" conduct does not mean that only egregious behavior is actionable, but neither do merely mild or isolated incidents of harassment suffice. *Dawson v. County of Westchester*, 373 F.3d 265, 273 (2d Cir. 2004). Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe. *See, e.g.*, *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (sexually explicit verbal abuse of a female firefighter created a justified fear that she would be left in peril at fire scenes); *Tomka*, 66 F.3d at 1305 (observing that a single sexual assault may be sufficient to alter the terms and conditions of the victim's employment).

"[T]he kinds of workplace conduct that may be actionable under Title VII … include '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a) (1985)). The Second Circuit distinguishes between "uninvited sexual solicitations; intimidating words or acts; [and] obscene language or gestures" and "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," the latter of which does not support a viable claim. *Redd v. New York Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012) (alterations in original) (citations omitted). "'Casual contact that might be expected among friends – [a] hand on the

26

shoulder, a brief hug or a peck on the check – would normally be unlikely to create a hostile

environment in the absence of aggravating circumstances such as continued contact after an

objection …. But when the physical contact surpasses what (if it were consensual) might be

expected between friendly coworkers ... it becomes increasingly difficult to write the conduct off as a

pedestrian annoyance.'" *Id.* (quoting *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006)

(internal quotation marks omitted).

     In support of her hostile work environment claim, Husser points to ten incidents involving

Shea, and two involving O'Connell, including email exchanges and comments at off-site gatherings,

over the course of three years, beginning in 2009 and continuing until July 2012:

- In late 2009, Shea showed Husser a picture of Executive Director of the OEEO Mecca Santana ("Santana") and said, "She is hot. I['d] do her."

- In late 2009 or early 2010, Shea told Husser than his nickname was "mosquito" because of the size of his genitalia and that he "could get it done without women knowing that they were stung."

- On December 6, 2010, Husser sent Shea an email about taking leave time for the Christmas holiday period, to which Shea responded "Ho ho ho." Husser replied, "Who you calling ho?" and Shea in turn responded, "You, b!t©h!"

- In 2010, after exchanging some emails, Shea allegedly walked over to Husser's desk and mouthed the words "blow me."

- In 2010, Shea told Husser that he was not wearing underwear before going out for a run.

- In 2010, Shea also brought a tablet computer to work and showed Husser a photograph of himself in a speedo on a cruise. Shea zoomed in on his crotch once Husser looked at the screen.

- In 2010, after work and off-site, Husser gave a female employee a hug goodbye. O'Connell asked, "Where's mine?" which made Husser feel uncomfortable. Despite allegedly being uncomfortable, Husser gave O'Connell a hug.

- At another off-site gathering in 2010, O'Connell allegedly repeatedly used the word "cunt," though it is unclear to whom and in what context it was used.

- In 2011, during a meeting, Husser became upset and Shea allegedly commented that Husser was being "too emotional."

- In 2012, in response to an email inquiry about a presentation involving office dress code, Shea wrote to Husser, "No cameltoes and no visible muffin tops." Husser replied, "How about rolled up sock strategically placed?" Shea responded, "Absolutely, positively appropriate. How else would I maintain credibility?" Husser then replied, "Seriously, telling them appropriate and professional leaves a lot of leeway …."

- In 2012 Shea asked Husser, "[W]ho'd believe that you were married?"

- From early 2012 until July 2012, Shea changed his clothes in the conference room frequently. Husser complained and Shea responded that if someone walked in on him, they "wouldn't see anything big."

Complaint ¶ 16; Pl. Stmt. ¶¶ 103-119.

The defendants argue that these comments are not sufficiently pervasive or severe and that such comments did not alter the terms or conditions of her employment. I agree. First, the twelve cited remarks and events over the course of a three-year period are not sufficiently pervasive. "The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (finding that nine comments made over a seven month period were too infrequent to be severe or pervasive). "Isolated, minor acts or occasional episodes do not warrant relief." *Brennan v. Metro. Opera Assoc.*, 192 F.3d 310, 318 (2d Cir. 1999); *see Augustin v. Yale Club*, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (finding "infrequent and sporadic" remarks made over the course of five years, "insufficient, as a matter of law, for Plaintiff to maintain a hostile work environment claim"); *Trinidad v. New York City Dep't of Corr.*, 423 F. Supp.2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of supervisors calling plaintiff a "bitch" and making sexual remarks over five years of employment

28

insufficient to support a claim of discriminatory harassment). These incidents are episodic at best and are not sufficiently continuous to be deemed pervasive.

Second, the cited incidents – however inappropriate and boorish – are insufficiently severe under the law of this circuit. For example, the parties agree that when Shea mouthed the phrase "blow me," he was not making a sexual advance, but rather intended to be sarcastic. Stodola Decl., Ex B (Husser deposition) ("Husser Dep.") at 386. Indeed, Husser has not suggested, and nothing indicates, that any of the incidents were sexual advances or threats. *See Redd*, 678 F.3d at 177. Moreover, Husser acknowledged that some of the conduct at issue was not necessarily directed at her: she was never directly called a "girl" nor was Shea's changing in the conference room directed at her. Husser Dep. at 387. Further, while certain facts are in dispute, the record is clear that Husser participated in the sexual banter along with her supervisors. *See* Stodola Decl., Ex. H (showing an email chain between Shea and Husser where Shea says "ho ho ho" and Husser responds, "who you calling a ho?"). Further, several of the cited incidents could also reasonably be interpreted to be gender-neutral and not necessarily directed at Husser because of her gender – Husser acknowledges that Shea directed some of the comments at issue not just to herself, but also to men. Husser Dep. at 387-88.

Viewed in the aggregate, the conduct of which Husser complains is no more pervasive and severe than conduct in other cases that courts have found insufficient to support liability. *See Vito v. Bausch & Lomb Inc.*, 403 F. App'x 593, 596-97 (2d Cir. 2010) (finding allegations that a supervisor who intentionally touched plaintiff's breasts and made irritating and inappropriate comments failed to show the severity necessary to sustain a hostile work environment claim); *Geller v. N. Shore Long Island Jewish Health Sys.*, 2013 WL 5348313, at *7 (E.D.N.Y. Sept. 23, 2013) (concluding that twenty incidents including comments about plaintiff's breasts, drawing a penis on a whiteboard during a

meeting and one inappropriate touching of knee over five year period was insufficient to state a hostile work environment claim); *Robinson v. Purcell Const. Corp.*, 859 F. Supp.2d 245, 255 (N.D.N.Y. 2012) (finding that five gender-based comments occurring over a two month period were neither pervasive nor severe). *But see Redd*, 678 F.3d at 178-79 (finding that a supervisor touching an employee's breasts on three occasions presented a question of fact as to whether the abuse was sufficiently severe to create a hostile work environment, in part because the conduct could be physically threatening because the supervisor "repeatedly made physical contact with-and repeatedly felt-intimate parts of [the plaintiff]'s body"). I therefore respectfully recommend that the court grant the defendants' motion for summary judgment on Husser's claim for hostile work environment under federal and state law.

The hostile work environment claim under the NYCHRL fails for similar reasons. Although a claim under that statute required Husser to show only that she "has been treated less well than other employees because of her gender," *see Zambrano-Lamhaouhi*, 866 F. Supp. 2d at 161 (E.D.N.Y. 2011) (citing *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 36-39 (N.Y. App. Div. 2009)), I conclude that her hostile work environment allegations do not satisfy even that more forgiving standard. Instead, as discussed above, the alleged conduct is no more than what prior decisions have categorized as "petty slights and trivial inconveniences." *Mihalik*, 715 F.3d at 109 (citing *Williams*, 872 N.Y.S. 2d at 41). I therefore respectfully recommend that the court grant the defendants' motion for summary judgment on Husser's hostile work environment claim under the NYCHRL.

III.    Recommendation

For the reasons set forth above, I respectfully recommend that the court grant the defendants' motion for summary judgment with respect to the claims for hostile work environment under federal, state, and municipal law, and deny the motion in all other respects.

IV.     Objections

Any objections to this Report and Recommendation must be filed no later than September 29, 2015. Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order. *See* 28 U.S.C. §636(b) (1); Fed. R. Civ. P. 72(b) (2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

SO ORDERED.

Dated:  Brooklyn, New York
        September 15, 2015

                          _____/s/_____
                          JAMES ORENSTEIN
                          U.S. Magistrate Judge